**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ELSAMMA CHACKO,                          :
        Plaintiff,                :
                       :
v.                                       :        3:07-cv-1120 (CFD)
                       :
STATE OF CONNECTICUT, DEPARTMENT OF :
MENTAL HEALTH AND ADDICTION              :
SERVICES,                                :
        Defendant.                :

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Elsamma Chacko, brings this action for race/national origin discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. The defendant, Connecticut Department of Mental Health and Addiction Services ("DMHAS"), moves for summary judgment. For the reasons that follow, the defendant's motion is granted in part and denied in part.

**I.      Background**[1]

Chacko is an Asian female of Indian descent. Since January 23, 2004, Chacko has been employed by DMHAS in the position of Principal Physician at the Connecticut Valley Hospital ("CVH"). CVH is a hospital for inpatients who are wards of the State and who have psychiatric

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated. It should be noted that the defendant objects to the plaintiff's Local Rule 56(a)2 statement because she did not ask permission to file a subsequent statement and because it allegedly attempts to change her prior admissions and prior sworn testimony. Although the Court recognizes the defendant's objection, the Court will consider Chacko's Local Rule 56(a)2 statement in conjunction with the other statements, admissions, and evidence submitted by the parties.

disorders, substance abuse disorders, or co-occurring disorders.  The hospital has three divisions: the Whiting Forensic Division ("Whiting"), which is a maximum security facility; the General Psychiatry Division ("GPD"); and the Addiction Services Division ("ASD").  Each division is further broken down into units, and the divisions have different numbers of patients and units. All three of these divisions are under the umbrella of the Ambulatory Care Services Unit ("ACS").

At all relevant times three other doctors at CVH held Chacko's position of Principal Physician: Dr. Dargan, an Asian female of Indian descent;  Dr. Saeedi, an Asian male of Iranian descent; and Dr. Timmerman, a Caucasian male.  Additionally, Dr. Engelman, a Caucasian male, and Dr. Santhappa, an Asian male, were two of approximately five staff physicians working at CVH.[2]  At the times relevant to this lawsuit, the doctor-to-unit assignments were made by the Director of ACS, Barbara Forgit, the Medical Director, Dr. Kenneth Freedman, and the Chief of Professional Services, Dr. Cynthia Conrad.  Forgit, Freedman, and Conrad assert that they made duty assignments using an algorithm that factored in patient acuity, the complexity of the management of the patient's condition, and the turnover of patients.  Chacko disputes that this algorithm was ever used.  In addition to making regular duty assignments, Freedman, Conrad, and Forgit also made duty assignments for coverage when a physician or practitioner was absent. These coverage assignments were in place pursuant to a prepared schedule.  Chacko argues that while these coverage arrangements were sufficient when a doctor was absent for one or two days, they were insufficient when a doctor was absent for a longer period of time.  Moreover, Chacko claims that even when she was covering for another physician, the Physician's Assistants

---

[2] Dr. Engleman was eventually given the title of Principal Physician.

("PAs") and Advanced Nurse Practitioners ("APRNs") were only assigned to help the Caucasian doctors.  For example, although APRN Tagon-Conroy was supposed to help out where needed, according to Chacko she was assigned to the Caucasian doctors almost exclusively.

At the core of Chacko's complaint is her claim that she and other Asian doctors were assigned heavier workloads than their white counterparts, and that when she complained about the heavier workload, her supervisors retaliated against her by giving her negative performance reviews and "micro-managing" her work.[3]  The parties dispute the relative difficulty of work in each of the three divisions of the hospital.  The defendant argues that GPD has a relatively static population with minimal turnover and average acuity and medical complexity.  Therefore, the defendant contends, compared to ASD and Whiting, GPD units are less work-intensive because ASD and Whiting have high turnover rates and require doctors to complete new histories and physicals frequently.  Chacko, on the other hand, argues that GPD units are more work-intensive than units in Whiting and ASD, as chronic patients are also susceptible to more serious illness than residents of other units.  Moreover, GPD has 88% of the deaths in the hospital and generates the largest number of visits to outside emergency rooms and acute care facilities.  Chacko argues that while Whiting is labeled "maximum security" because the patients have legal problems, it is in actuality populated with younger patients whose medical issues are minimal.

A.    2004 Coverage for Dr. Dargan

When Chacko began her clinical work at CVH in March 2004, she was assigned three

---

[3]  It should be noted that several of Chacko's exhibits are charts and summaries that she personally compiled.  These exhibits are not sworn under oath, and at least in some cases the source of the information is unclear.

units in the GPD division.[4]  From March 8, 2004 through June 11, 2004, however, her actual workload was significantly greater because she was assigned to cover Dr. Dargan's units while Dargan was on extended medical leave.  During this time, CVH hired Dr. Shah, a 120-day staff physician, to assist in coverage of Dargan's units.  Chacko did not have to cover Dargan's units on days when Shah worked at CVH, but the parties dispute how many days Shah actually worked.  Chacko claims that Shah worked only about two-and-a-half days per week, while the defendant contends Shah worked for sixty-one days during this period.  Additionally, Ed Drew and Frank Martin helped Chacko with her assigned coverage during this period, though Chacko claims their help was minimal.

Dr. Dargan worked four hours a day from June 11, 2004 through June 30, 2004.  Chacko claims that she covered the remainder of Dargan's wards during this time period.  Chacko also alleges that she had to cover Dargan's units from September 3, 2004 through November 30, 2004 while Dargan was out on worker's compensation. Chacko alleges that this approach to coverage was typical.  Specifically, Chacko claims that although Asian physicians typically covered the entire workload of an absent physician, Caucasian physicians had the absent doctor's shift split among several different clinicians.

B.      July 2004 Six-Month Probationary Performance Appraisal

On July 23, 2004, Dr. Freedman completed Chacko's initial probationary performance appraisal.  According to Chacko, her rating was a "4.5" which translates to an "excellent" rating.[5]

---

[4] Those units were: B3N (Intensive Treatment Unit), B2S (Traumatic Brain Injury Unit), and B2N (Acquired Brain Injury Unit).

[5] The performance review noted an overall rating of "4"; however, an average of all of the individual ratings does result in a "4.5" rating overall.

The performance review, however, did note a few areas where improvement was needed. Specifically, Freedman noted that Chacko "needs to improve time management skills.  Needs to improve completion of Medical Histories and Physicals in a more timely fashion.  Needs to improve documentation on pharmacologic therapy."

C.    Rosellen Duncan Complaints & Incident; Chacko's Suspension

Chacko contends that in February 2005, four Asian physicians and Dr. Engelman met with Barbara Forgit to report significant problems with Forgit's secretary, Rosellen Duncan.  On July 21, 2005, an incident occurred between Chacko and Rosellen Duncan in which Chacko allegedly grabbed Duncan's arm.  Chacko denies grabbing Duncan's arm.  On December 7, 2005, after an internal investigation, Chacko was suspended without pay for ten days for violating DMHAS General Work Rule # 19, by "angrily grabb[ing] the arm of [Rosellen Duncan][,] pull[ing] [Duncan] towards you and demand[ing] that she look at your face."  The defendant claims that there is no evidence that Forgit or Freedman participated in the decision to suspend Chacko or that they were otherwise involved in the investigation of the complaint.  According to Chacko, however, Forgit participated in the investigation and grievance procedures, asking purported witnesses to write statements as part of the investigation, attending meetings with Chacko and an HR representative, and testifying against Chacko in the arbitration proceedings. Chacko challenged the suspension through the internal grievance procedure, and the arbitrator reduced the suspension to one day, finding that the ten day suspension was without just cause. Although the punishment was found excessive, the arbitrator also found that "Dr. Chacko did grab Ms. Duncan's arm and that Ms. Duncan's version of the incident must be accepted."

On July 26, 2005, six Asian physicians wrote a memo to Forgit summarizing their

continuing problems with Ms. Duncan.  According to Chacko, Forgit ignored these issues and later required any contact with the ACS office to go through Duncan directly.

D.      Redistribution of Work Assignments

On July 28, 2005, Dr. Freedman announced that, effective August 1, 2005, workloads would be redistributed because a part-time physician was leaving CVH.  Chacko was assigned an additional unit in the redistribution, bringing her workload to a total of four units.  Staff Physician Dr. Engelman and Staff Physician Dr. Santhappa also carried four units.  Under this arrangement, Dr. Engelman was responsible for approximately 79 patients in Whiting; Dr. Santhappa was responsible for 96 patients in the Dutcher Enhanced Security Service in Whiting; and Chacko was responsible for 89 patients in the GPD.  Chacko contends that the reorganization resulted in increased workloads for Asians, but not for Caucasians, specifically noting that the workload for one Caucasian doctor remained the same while the workload for the other Caucasian doctor decreased.  Chacko claims that she was told this arrangement was fair because she, Engleman, Timmerman, and Santhappa all had four units; however, Chacko asserts that the four units contained different amounts of work.

Following the redistribution announcement, Chacko wrote a letter to Forgit, dated July 29, 2005, requesting that she reconsider Chacko's assumption of a fourth unit.  Specifically, Chacko said that "it is impossible for me to be responsible for all four of these particular units and provide acceptable patient care."  Except for mentioning that only herself and Dr. Saeedi were assigned additional units, there was no reference or implication that Chacko's complaint was related to the fact that she is Asian.  On August 9, 2005, Forgit and Dr. Freedman met with Chacko to discuss her concerns.  They discussed organization and time management, and

Freedman provided examples of how Chacko might prioritize clinical work, including examples of clinical matters that could reasonably be left for the next day.

Following this meeting, Dr. Freedman and Forgit agreed that they would have weekly supervisory meetings with Chacko to go over Chacko's record-keeping and patient charts. Chacko argues that these meetings were punishment for her prior complaints.  Apparently three meetings of this type were held on August 9th, 29th, and 31st of 2005.   In September 2005, Dr. Conrad and Dr. Freedman decided to reduce Chacko's number of patients.  According to Conrad, this change was made "because Dr. Chacko's clinical work was not as thorough as it needed to be, [and] she was not following up with patients' medical issues and she was not properly documenting the patients' charts."  This change resulted in Chacko losing one unit and gaining another, the net result being that she was responsible for ten fewer patients.

E.     Official Complaints

Chacko filed an internal Affirmative Action Complaint on September 7, 2005 alleging discrimination based on race/color and national origin.  Although the investigator noted that Chacko's caseload was larger than that of the Caucasian doctors, and was the second largest in ACS, he also found that the hospital's policy against racial and national origin discrimination was not violated.  The plaintiff then filed a complaint dated October 18, 2005 and that was received by the Commission on Human Rights and Opportunities ("CHRO") on October 21, 2005.  DMHAS received notice of the complaint on November 9, 2005.

F.     2005 Performance Appraisal

Chacko was supposed to receive an annual performance appraisal on September 19, 2005. Although the performance appraisal was signed by Dr. Freedman on September 19, it was not

signed by Forgit or Conrad until December, and was not given to Chacko until December 27, 2005.  Chacko claims that some of the comments written on her appraisal were not actually written in September, but were "backdated" and actually written after she filed her complaint with the CHRO.  Particularly of note was the fact that the review mentioned her suspension, although that was not decided until December.

Chacko alleges that her overall rating for this evaluation was "3.5," which correlates to a "good" rating.  Her review, however, reported her overall rating as a "1," or an "unsatisfactory." Chacko claims that Freedman and Forgit intentionally miscalculated her average rating. Although Chacko's evaluation was, in general, better than unsatisfactory, it included the following comments: "time management problems which need significant improvement"; "still needs to improve time management when cross-covering"; "documentation needs greater detail. PEs need to be reliably completed on time"; "needs to be more flexible with cross-coverage or assignment changes"; "progress note documentation needs much more detail"; "poor documentation on laboratory results and their interpretation"; "consultation request forms often have insufficient documentation requiring them to be returned for further elaboration"; "needs to prioritize tasks better to improve efficiency and time management."  In response to the unsatisfactory performance review, Chacko received a letter from Human Resources dated January 18, 2006, noting that she could be subjected to possible dismissal.

According to Chacko, she complained about the evaluation to union delegate Michele Daniels, who then complained to Human Resources.  At a meeting with personnel administrator Fred Ferris, Daniels pointed out that the math in the evaluation did not add up to a score of "1" and that the appraisal had been inappropriately held back.  Because the evaluation was not

completed within the appropriate time period, it was removed from Chacko's personnel file on February 17, 2006.

G.     Other Allegedly Discriminatory Practices

Chacko also claims that Caucasian doctors were given paid time off to attend conferences, while similar requests by Asian doctors were refused.  Moreover, Dr. Saeedi, an Asian physician, was apparently compelled to move his belongings into a different office when Dr. Timmerman, a white doctor, was hired.  According to Chako, Saeedi's new office was in an older, less convenient building.  Chacko claims that the treatment of Timmerman was in stark contrast to her own experience upon arrival at the hospital—namely, she was required to share an office with another Asian physician for months before she received her own office.  Chacko claims that these discriminatory actions were repeated when Forgit gave the Caucasian Dr. Engelman the office of Dr. Santhappa, an Asian doctor who was away in India.  According to Chacko, Santhappa returned from India to find all of his belongings removed, and he was without an office for two months.  Similarly Dr. Dargan was allegedly asked to empty her office so that two Caucasian employees, neither with patient care responsibilities, could have it instead.

H.     Supplemental Doctor Affidavit[6]

Chacko also submits the affidavit of Dr. Saeedi, who states that he has "observed [the] preferential treatment [that] has been extended to Caucasian physicians who joined the staff,"

_____

[6]  The defendant argues that these affidavits should be disregarded because they were not listed as potential witnesses in response to the defendant's interrogatories.  However, both of these individuals are employees of the defendant, both are of Asian descent, Chacko describes the level of work given to both individuals in her interrogatories, and both individuals signed the letter to Forgit regarding Duncan's behavior.  Therefore, the defendant had notice of their potential relevancy to this case.

and that "I believe that the plaintiff has been the recipient of similar discriminatory treatment at work during her tenure with the defendant."  Dr. Dargan echoes these statements in her affidavit, noting that during her employment she has "witnessed the administration give preferential treatment to Caucasian physicians, at the expense of non-Caucasian physicians."  Saeedi's supplemental affidavit also corroborates Chacko's claim that he had to give up his office, as well as his PA, for Dr. Timmerman.

Chacko claims that the defendant violated Title VII by assigning Asian physicians significantly heavier workloads than Caucasian physicians, by creating a hostile work environment based on race and national origin, and by repeatedly retaliating against her when she complained about the treatment of Asian physicians.

The defendant moves for summary judgment claiming that the allegations of heavier workload do not constitute an adverse employment action under Title VII and that, even if it did, the defendant has offered a legitimate non-discriminatory reason for the assignment of workloads—the algorithm—which Chacko cannot rebut.  The defendant also argues that Chacko's claims are all facially neutral and, as such, cannot support her allegations of hostile work environment.  Finally, defendant claims that Chacko cannot establish an adverse employment action or a causal connection between allegedly protected activity and the claimed adverse employment action for the purposes of her retaliation claim.

**II.    Discussion**[7]

---

[7]  The defendant argues that the Court should disregard Chacko's "new" arguments because they were not raised previously and were not disclosed during discovery.  However, in her motion to supplement the opposition to the motion for summary judgment, Chacko does offer an explanation for not raising these arguments sooner—namely, that she brought numerous errors to the attention of her counsel, but that counsel had failed to raise these issues with the Court.

A.      Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court

must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

56(c)); accord Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993).  A dispute regarding a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson, 477 U.S. at 248.

When examining a motion for summary judgment the Court resolves all ambiguities and

draws all permissible factual inferences in favor of the nonmoving party.  Patterson v. County of

Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which

a reasonable inference could be drawn in favor of the opposing party on the issue on which

summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old

Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).  However, a party may not create a

genuine issue of material fact by resting on the "mere allegations or denials" contained in his

pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

B.      National Origin Discrimination

---

Much of the "new" information that Defendant complains of is information or facts that are in
the possession of the defendant and/or its employees.  Additionally, because the motion to
supplement was granted, in part, to address these "new" arguments, the Court declines to
disregard them.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Courts analyze these claims under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this standard, to establish a prima facie case of discriminatory treatment based on an adverse job action, a plaintiff must show "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).  The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis."  See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).  Once a plaintiff has established a prima facie case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  If the defendant is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."  Id.

"Direct evidence of discrimination is not necessary, because proof is seldom available with respect to an employer's mental processes.  Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file.  Ordinarily, plaintiff's evidence

establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (internal citations omitted). The plaintiff may establish a genuine issue of material fact either through statistical or circumstantial evidence that the employer's reasoning is false and that discrimination motivated the employer. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994).

It is undisputed that Chacko is a member of a protected class and that she is qualified to be a Principal Physician. The defendant contends, however, that Chacko has not suffered an adverse employment action and has not presented evidence giving rise to an inference of discriminatory intent.

i.    *Adverse Employment Action and Inference of Discriminatory Intent*

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Feingold, 366 F.3d at 152 (internal quotations and citations omitted). The Supreme Court recently wrote of adverse employment actions in the context of Title VII: "We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.' " Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices unique to a particular situation." Feingold, 366 F.3d at 152 (internal quotations and citations omitted).

Chacko's main argument regarding adverse employment action is that she experienced a disproportionately heavy workload because of her national origin. A "[d]isproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job classification." Young v. Rogers & Wells LLP, No. 00 Civ. 8019(GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 06, 2002). In Feingold, the Second Circuit held that the plaintiff had demonstrated that he was subjected to an excessive workload as a result of discriminatory intent. Feingold, 366 F.3d at 153. Specifically, the plaintiff presented evidence that cases originally assigned to African-American individuals were reassigned to white individuals, and that assignments were often re-shuffled to give the white individuals more work. See id.; see also Avillan v. Potter, No. 04 Civ. 9019(PKC)(FM), 2006 WL 3103309 (S.D.N.Y. Nov. 1, 2006) (noting that plaintiff demonstrated adverse employment action when he was given more work than other employees "quite often"); Warren v. N. Shore Univ. Hosp., No. CV-03-0019(DGT)(RML), 2006 WL 2844259 (E.D.N.Y. Sept. 29, 2006), aff'd Warren v. N. Shore Univ. Hosp., 268 F. App'x 95 (2d Cir. 2008) (noting that plaintiff alleged adverse employment action because she was assigned a more strenuous workload, though declining to uphold plaintiff's retaliation claim for failure to cite evidence of pretext).

Chacko has put forward sufficient evidence to satisfy the minimal burden of demonstrating adverse employment action for the purpose of a prima facie case. The defendant's

own exhibit notes that Chacko had a heavier caseload than the white doctors; in fact, the affirmative action investigator's report states that Chacko had the second-highest caseload of all of the doctors—the first highest being held by another Asian doctor.[8]  Moreover, while Chacko was assigned the same number of units as the Caucasian doctors, these units were not equivalent in workload.  Additionally, while Chacko was covering for Dr. Dargan, Chacko sometimes had responsibility for double or more of a Principal Physician's normal workload.  Chacko also notes that Caucasian doctors did not work such long coverage shifts for as many days.

Although Chacko did receive some assistance during her coverage period, it is disputed how much assistance she actually received.  Moreover, she claims that she never received long-term assistance from a PA, although the white doctors, with lower caseloads, did.  She presents additional evidence about PA assistance in the form of Dr. Saeedi's affidavit, in which Dr. Saeedi states he had to give his PA to the Caucasian Dr. Timmerman after Timmerman was hired.  Finally, Chacko has presented evidence showing that when work was redistributed in 2005, the work was given to Asian employees instead of Caucasian employees.

Therefore, taking the facts in the light most favorable to the plaintiff, Chacko has established a prima facie case that the disproportionately heavy workload was an adverse employment action that occurred under circumstances giving rise to an inference of discriminatory intent on the part of the defendant.  See Graham, 230 F.3d at 39 ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.").

---

[8]  The report also notes that the caseloads of the four other Asian doctors are smaller than the three Caucasian doctors; however, this finding is not dispositive.

ii.     *Legitimate, Non-Discriminatory Reason*

The defendant has advanced a legitimate, nondiscriminatory reason for Chacko's heavy workload.  Specifically, the defendant claims that Forgit, Dr. Freedman, and Dr. Conrad made duty assignments using an algorithm that factored in patient acuity, the complexity of the management of the patient's condition, and the turnover of patients.  Moreover, in explaining Chacko's large caseload during Dr. Dargan's absence, the defendant notes that there was an established coverage system in which one doctor would cover for another doctor when that doctor was absent, and vice versa.  Therefore, Chacko must demonstrate that a material issue of fact exists over whether this legitimate reason is a pretext for discrimination.

iii.    *Pretext*

Chacko has demonstrated that material issues of fact exist regarding pretext.  Although the defendant notes that the hospital used an algorithm to assign workload, no evidence of the application of this algorithm has been provided to the Court.  Moreover, it does not appear that the algorithm accounts for the apparent disparity in assigning PAs.  The defendant argues that because Chacko admits she received the assistance of PAs during the time she was covering for Dr. Dargan, her claim that the PAs were assigned only to Caucasians fails as a matter of law.  The amount of time that the PAs helped, however, is a disputed issue of material fact, and Chacko claims they gave her only three hours of assistance.  Regardless of the amount, taking the facts in the light most favorable to the plaintiff, the evidence shows that the PAs remained assigned only to the Caucasian doctors, even though the two busiest physicians were Asian.  Although Chacko's workload was eventually decreased, cf. Sacco v. Legg Mason Inv. Counsel & Trust Co., 660 F. Supp. 2d 302, 313–14 (D.Conn. 2009) (plaintiff's claim that increased

workload was in retaliation to her complaint about harassment failed when, after she complained about the increased workload, her workload was reduced), the September 2005 decrease only resulted in a net loss of ten patients.   This decrease does weigh against Chacko's argument of discrimination; however, this decrease alone is not sufficient to prove absence of material fact regarding discriminatory motivation.   Thus, the defendant's motion for summary judgment on the Title VII discrimination claim is denied.

C.      Hostile Work Environment

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted); see Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).  In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances.  See Harris, 510 U.S. at 23.  A non-exclusive list of factors that courts consider in making such a determination includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.  Title VII is not "a general civility code," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."  Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure

in order to establish a hostile work environment." Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989); see also Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."). To demonstrate that the harassing conduct was continuing or pervasive, it is also relevant to look at the treatment of other similarly situated individuals. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 151 (2d Cir. 1997); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (noting that the Court may also look at the treatment of other minorities not of the plaintiff's race). In evaluating the totality of the circumstances, the Court must look at the evidence cumulatively "to obtain a realistic view of the work environment." Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997).

The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive. Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997). The plaintiff must also show that the hostility was due to her membership in a protected class. Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).

The defendant claims that portions of Chacko's hostile work environment claim are time-barred because she cites to incidents that occurred outside of the 300-day statutory limitation

-18-

period.[9]  See 42 U.S.C. § 2000e-5(e)(1).  However, as the Supreme Court noted in Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002), hostile work environment claims are

"composed of a series of separate acts that collectively constitute one unlawful employment

practice." (internal quotations omitted).  "The timely filing provision only requires that a Title

VII plaintiff file a charge within a certain number of days after the unlawful practice happened.

---

[9] The defendant does not argue that Chacko's other claims are time-barred, but rather that she failed to exhaust her "new arguments" in her CHRO filings.  A district court can only hear Title VII claims that are either included in the administrative charge or based on conduct which is reasonably related to the conduct in the charge.  Butts v. N.Y. Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993); see also Francis v. City of New York, 235 F.3d 763, 766 n.1 (2d Cir. 2000) (noting that although there was some language in Butts that stated the "reasonably related claims" had to occur subsequent to the administrative investigation, Butts itself held that two claims arising from uncharged, pre-charge conduct were exhausted).  There are three types of situations where claims are "reasonably related" to those asserted in an administrative filing: (1)"where the conduct complained of would fall within the scope of the administrative investigation;" (2) where the employee alleges retaliation by an employer against the employee for filing an administrative charge; and (3) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the administrative charge."  Butts, 990 F.2d at 1402–03.  "In this inquiry, the focus should be on the factual allegations made in the [administrative] charge itself, describing the discriminatory conduct about which a plaintiff is grieving."  Pleau v. Centrix, Inc., 501 F. Supp. 2d 321, 326 (D.Conn. 2007).  The defendant conclusively states that Chacko cannot fulfill any of these criteria.  However, almost all of these "new" arguments fall under the classifications noted above.  Chacko's CHRO complaint alleged disparate treatment between Asian and non-Asian physicians, particularly emphasizing heavier workloads, as well as retaliation for making those complaints.  Therefore, Chacko's claims that Duncan failed to assist Asian physicians with cross-coverage and that Caucasian physicians received more help during coverage clearly are within the scope of the administrative investigation.  Moreover, because the CHRO complaint discusses the differential treatment of Caucasian and Asian physicians, Chacko's claims that Asian physicians were assigned less desirable offices and were forced to move for Caucasian physicians and that Caucasian physicians received more time off for conferences would also be within the scope of the CHRO investigation.  Additionally's Chacko's claim that her performance evaluation was "mis-graded" would fall under classification number two—retaliation.  Although it is questionable whether the claims that Duncan made several errors on the plaintiff's time sheets; that clinicians were required to sign their time sheets at Duncan's desk; that Duncan recently accused Dr. Dargan of theft; and that Duncan recently removed the plaintiff's name from an email list are exhausted, the Court's decision is unchanged regardless of the inclusion of these allegations in the analysis.

It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id.  Because Chacko's claim encompasses acts from 2004 through 2007, and some of those acts occurred during the filing period (namely the August increase in workload), the court declines to find that any portion of the hostile work environment claim is time-barred.

Turning to the merits, Chacko claims she was subjected to a hostile work environment because the Caucasian physicians were consistently treated differently than the Asian physicians. Specifically, she notes that the Caucasian physicians were favored in scheduling, the assignment of offices and PAs, as well as the allowance for continuing education.  Moreover, Chacko points to Duncan's persistent and continued hostility, allegedly directed only toward Asian physicians, which culminated in accusations of improper physical contact and Chacko's suspension.  Chacko claims that in response to her complaints regarding Duncan and Chacko's workload she was intimidated and humiliated by Forgit and Freedman.  Specifically, she claims that within a week of the July 29, 2005 letter, she was accused of assaulting Duncan, which resulted in her suspension; that she was subjected to weekly reviews of her record-keeping; that she received a backdated "unsatisfactory" evaluation; and that she was warned that one more unsatisfactory evaluation could result in her termination.

These claims are all facially neutral.  "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact,

based on" the protected characteristic.  Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002); see

also Woods v. Newburg Enlarged City Sch. Dist., 288 F. App'x 757, 759 (2d Cir. 2008)

("Alfano's observation that incidents that are facially sex-neutral may sometimes be used to

establish a course of sex-based discrimination presumed evidence of multiple acts of harassment,

some overtly sexual and some not.").  Because Chacko is "relying on facially neutral incidents,"

she must offer some additional evidence, circumstantial or otherwise, from which a reasonable

jury could infer that the actions were discriminatory.  See Alfano, 294 F.3d at 378;  Khan v. HIP

Centralized Lab. Servs., Inc., No. CV-03-2411 (DGT), 2007 WL 1011325, at *5 (E.D.N.Y. Mar.

30, 2007); see also Raniola v. Bratton, 243 F.3d 610 (2d Cir. 2001) (finding evidence of

disparate treatment in hostile work environment claim where female officers were subjected to

offensive sex-based remarks, denied work requests given to males, were subjected to higher

standards and tougher details, and were given work normally given to the most junior officers).

In Murray-Dahnir v. Loews Corp., No. 99 CIV, 9057 LMM, 1999 WL 639699, at *4

(S.D.N.Y. Aug. 23, 1999), the District Court for the Southern District of New York granted a

motion to dismiss, finding that the facially neutral actions alleged by the plaintiff could not

support a claim of hostile work environment, though they might support a claim of failure to

promote.  There, the plaintiff claimed that he had extraordinarily longer working hours than non-

African Americans, that he worked those hours without proper staffing and support, that his

supervisors stopped directly speaking with him and publicly and unjustifiably admonished him

on numerous occasions, and that he received a memorandum from his supervisors containing

"illegitimate and pretextual criticism."  Id.

Chacko has not shown that a genuine issue of material fact exists with regard to hostile

work environment discrimination.  As in <u>Murray-Danhir</u>, it appears that these "non-racial forms

of hostility," without more, cannot support a claim of a racially hostile working environment.

<u>See</u> <u>id.</u> (<u>citing</u> <u>Oteri-Harkins v. City of New York</u>, No. 97-CV-2309 (JG), 1998 WL 817689, at

*7 (E.D.N.Y. Feb. 5, 1998)).  For example, Chacko has offered no evidence, other than her

speculation, that the incident regarding physical contact with Duncan was fabricated based on

Chacko's race or national origin.  Although Chacko maintains her innocence in the matter, the

arbitrator did find that Chacko grabbed Duncan's arm and should have been suspended, albeit for

only one day.  Therefore, the evidence taken in the light most favorable to the plaintiff does not

demonstrate that the suspension was based on race.  Additionally, in her deposition Chacko

admits that she had problems with her charts, and there is no evidence that the charts of all Asian

physicians were hyper-scrutinized.  Therefore, a reasonable juror would not infer that the

meetings to review Chacko's work were based on her race.  Finally, the remaining facially-

neutral evidence is not severe or pervasive enough to be considered along the lines of

"discriminatory intimidation, ridicule, and insult."  The facts taken in the light most favorable to

the plaintiff do not demonstrate an environment in which race-based abuse is so pervasive that a

reasonable person would find it to be hostile.  Therefore, the defendant's motion for summary

judgment on Chacko's hostile work environment claim is granted.

D.    Retaliation

       Title VII also forbids retaliation against an employee for complaining of prohibited

employment discrimination, stating that "[i]t shall be an unlawful employment practice for an

employer to discriminate against any of his employees . . . because [the employee] has opposed

any practice made an unlawful employment practice by " Title VII.  42 U.S.C. § 2000e-3(a).  To

defeat a motion for summary judgment on a claim of retaliation, "the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks and alterations omitted).[10]  "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Id.

To succeed on a retaliation claim, the plaintiff must show that the employer could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII.  Galdieri-Abrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998); see McDowell v. T-Mobile USA, Inc., 307 F. App'x 531, 534 (2d Cir. 2009) (the plaintiff could not establish that he engaged in protected activity because he never explicitly complained about race discrimination, and there was no evidence, other than his own testimony, from which a jury could conclude that the supervisors could have understood the complaints were about race).  "Absent a claim of unlawful discrimination, general complaints about employment concerns do not constitute protected activity under Title VII."  Potenza v. W. Irondequoit Cent. Sch. Dist., No. 06-CV-6407, slip op. 2009 WL 2876204, at *6 (W.D.N.Y. Sept. 2, 2009).

---

[10] There is no issue of fact over whether the defendant was aware of Chacko's activity.

i.      *Protected Opposition*

Chacko alleges retaliation for her July 29, 2005 letter to Forgit, in which she claims she "raised questions about the inequitable division of labor in work assignments between Asian physicians and the white physicians."  In actuality, the July 29th letter does not specifically make any statements about Asian physicians being treated differently than white physicians.  Rather, the letter merely states: "I also noticed that the net result of all these changes is that Dr. Saeedi and Dr. Chacko ended up with one extra unit each."  This letter reads as a general complaint about work-related incidents.  There is no indication in the letter that Chacko is complaining about discrimination based on race or national origin.  Therefore, Chacko did not engage in protected activity by writing this letter.

The complaints against Duncan, however, are different.  Chacko has alleged that in February 2005, Chacko, Dargan, Saeedi, and Santhappa all attended a meeting with Forgit at which they told Forgit that Duncan was rude to Asian physicians, but not to the Caucasian physicians.  Dr. Engleman also attended that meeting, but stated that he had never had any problems with Duncan.  Although "rudeness" generally does not amount to a violation of Title VII, taking the facts in the light most favorable to the plaintiff, a reasonable jury could find that Chacko engaged in protected activity in making this complaint.

The second complaint about Duncan came from the Asian physicians via a letter dated July 26, 2005.  Although this letter does not explicitly mention disparate treatment based on race, it does state that "[i]t is quite clear that some of the physicians are much more affected by [Duncan's] behavior than others."   Taking this statement in light of the prior complaint and in the light most favorable to the plaintiff, a reasonable jury could find that Chacko engaged in

protected activity in making this complaint.

On September 7, 2005 and October 18, 2005, Chacko filed an affirmative action complaint and a complaint with the CHRO, respectively.  These filings constitute protected activity.

ii.     *Adverse Action and Causal Connection*

An adverse employment action "is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Clayton v. City of Middletown, 564 F. Supp. 2d 105, 112 (D.Conn. 2008) (citing Burkybile v. Bd. of Educ., 411 F.3d 306, 313–14 (2d Cir. 2005)).   Chacko claims the following retaliatory adverse employment actions: increasing her workload; micro-managing her work in August 2005; the investigation of the Duncan complaint and ten-day suspension; her "unsatisfactory" and delayed employment evaluation and the subsequent threat of termination.

"To qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences."  Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003).  Embarrassment or anxiety are not sufficient to constitute adverse action.  See id.  District Courts within the Second Circuit have often found that "reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." Abraham v. Potter, 494 F. Supp. 2d 141, 147 (D.Conn. 2007).  But cf. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (listing reprimand as a potentially adverse employment action). Here, Chacko claims that the excessive scrutiny she experienced was accompanied by fourteen citations.  There is no evidence, however, of what constitutes a citation.  In her deposition

Chacko states that a citation is "something I didn't do right. You know, something faulty with my care." (Chacko Dep. 134:8–9.) There is no evidence whether the citations were formal reprimands, were documented in Chacko's file, or had any other adverse effect on Chacko's employment. Moreover, in her deposition, Chacko admitted that there were problems with her charts. (Id. 177:12–14.) ("Q: But as far as your charts, did you agree that there were problems with your charts? A. Sure, sure."). Thus, the "excessive scrutiny" and citations received by Chacko were warranted criticism. See Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002) (noting that counseling session regarding areas that plaintiff admitted were of concern was not retaliation because criticism of an employee is not an adverse employment action). Therefore, because Chacko admitted problems with her charts and did not experience any negative results because of the meetings, the "excessive scrutiny" she experienced in August 2005 does not constitute adverse employment action.

Chacko's negative performance review and the accompanying letter regarding potential termination also do not constitute adverse employment action. "[N]egative performance evaluations, without any accompanying adverse consequences, are not adverse employment actions, a negative performance evaluation with adverse consequences may qualify as an adverse employment action." Wilks v. Elizabeth Arden, Inc., 507 F. Supp. 2d 179, 194 (D.Conn. 2007) (internal citations omitted)) (addressing negative performance evaluation as prima facie evidence of discrimination); see also Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000) ("A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment. An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to

detrimentally alter the terms or conditions of the recipient's employment." (citations omitted)).
In Riedinger v. D'Amicantino, 974 F. Supp. 322, 328 (S.D.N.Y. 1997) the District Court for the
Southern District of New York found that threats of termination and negative performance
evaluations, along with changes in work schedule, denial of leaves of absence, and insults,
demonstrated a prima facie case of adverse employment action because these threats at least
arguably affected the plaintiff's ability to perform her job.

Here, in response to her unsatisfactory employment evaluation, Chacko did receive a
letter from HR stating that unsatisfactory evaluations could result in termination.  However, the
unsatisfactory evaluation was removed from her file, and there is no evidence that she
experienced any adverse effects other than receiving the letter.  See Thomas v. Bergdorf
Goodman, Inc., No. 03 Civ. 3066(SAS), 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004)
(noting that "[t]he mere threat of disciplinary action, including the threat of termination, does not
constitute an adverse action materially altering the conditions of employment").  But cf.
Abraham, 494 F. Supp. 2d at 148–49 (seven day "paper suspension" that was, one month later,
designated as an "official discussion" could be considered a probationary period that may
constitute an adverse employment action).

Although the withholding of the employment evaluation for five months and the
miscalculation of Chacko's overall employee rating are questionable actions, there is no evidence
that Chacko experienced any adverse consequences from them.  Chacko may argue that these
miscalculated performance reviews would deter other employees from making Title VII
complaints; however, because the employment review was removed from Chacko's file in a
timely manner and Chacko never experienced a cut in pay, a demotion or the like, this argument

is significantly weakened.  Therefore, Chacko has not demonstrated that the negative
performance review was an adverse employment action.

Although a heavily burdened workload may constitute adverse employment action,
Chacko has not produced any evidence that the increase in her work was casually connected to
February 2005 her complaint about Duncan—the only complaint that arose before the increase in
workload.  "A causal connection between the adverse action and the protected activity, is
established where a plaintiff offers, (1) direct proof of retaliatory animus directed against the
plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action
occurred close in time to the protected activities."  Hunter v. St. Francis Hosp., 281 F. Supp. 2d
534, 547 (E.D.N.Y. 2003).  Moreover, for "mere temporal proximity" to be sufficient for the
purpose of establishing causality, the proximity must be "very close."  Clark County Sch. Dist. v.
Breeden, 532 U.S. 268, 273 (2001).

Here, Chacko neither has direct proof of retaliatory animus nor can she point to disparate
treatment of similarly situated individuals as there does not appear to be any similar increase for
half of the Asian physicians who complained about Duncan's behavior.  Moreover, the time-span
of nearly five months is too long to establish a causal connection based on proximity.  See
Sicular v. New York City Dept. of Homeless Servs., No. 09 Civ. 0981(AKH)(AJP), slip op. 2010
WL 423013 (S.D.N.Y. Feb. 4, 2010) (citing cases holding that time periods less than three
months were insufficient to establish a causal connection).  Therefore, Chacko cannot claim
retaliation based on increased workload.

Suspension is clearly an adverse employment action.  Moreover, a reasonable jury could
find the suspension to be causally connected to Chacko's complaint.  However, as noted above,

the defendant has put forward a legitimate reason for Chacko's suspension.  The defendant claims it began its investigation into the Duncan incident based on Duncan's complaint and eyewitness statements, not because of Chacko's protected activity or her race.  Chacko was then suspended after being found to have engaged in inappropriate physical contact with another employee.  The imposition of the suspension was upheld by an independent arbiter, though the length of the suspension was decreased.  Chacko has not presented any evidence other than speculation to show that the investigation or suspension was a pretext for discrimination on the basis of her race.  Therefore, she can not claim retaliation on those grounds.

Therefore, taking the facts in the light most favorable to the plaintiff, a reasonable jury could not find that the defendant retaliated against Chacko in violation of Title VII.  Thus, the defendant's motion for summary judgment is granted with respect to the retaliation claim.

## III.   Conclusion

Accordingly, the defendant's motion for summary judgment [Dkt # 29] is GRANTED IN PART and DENIED IN PART.

SO ORDERED this    30th    day of March 2010, at Hartford, Connecticut.


 /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**